United States Courts
Southern District of Texas
FILED

*August 25, 2020*

David J. Bradley, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **RONALD ELIZONDO SR. AND MARIA ELIZONDO, INDIVIDUALLY AND AS THE LAWFUL HEIRS OF THE ESTATE OF RONALD ELIZONDO JR.,** | § § § § § | |
| **Plaintiffs,** | § § § | |
| | § § | **CIVIL ACTION NO. 2:20-CV-00191** |
| **DONALD HINOTE; THE TEXAS DEPARTMENT OF SAFETY; THE CITY OF CORPUS CHRISTI; LORRAINE MATTHEWS; NUECES COUNTY, TEXAS; MARK GONZALEZ; MICHELLE PUTMAN; ANGELICA HERNANDEZ; AND SHARRA RODRIGUEZ,** | § § § § § § § § § § § | |
| **Defendants,** | § | |

---

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

---

**TO THE HONORABLE UNITED STATE DISTRICT JUDGE:**

**A. INTRODUCTION**

1.      NOW COMES Ronald Elizondo, Sr. and Maria Elizondo, individually and as representative of the Estate of Ronald Elizondo, Jr., also known as Nano Elizondo and files Plaintiff's First Amended Complaint complaining of Trooper Donald Hinote the Texas Department of Public Safety, the City of Corpus Christi, Lorraine Matthews, Nueces County District Attorney's Office, District Attorney Mark Gonzalez, Assistant District Attorney Anjelica

---

Hernandez, Assistant District Attorney Michelle Putnam, and Nueces County Victim's Coordinator Sharra Rodriguez.

2.     On July 10, 2019, Trooper Hinote shot Nano Elizondo, a 17-year-old adolescent, multiple times resulting in his death. Nano Elizondo's cause of death was determined by medical personnel to be directly caused by Trooper Hinote's shooting.   However, the moving force causing Nano Elizondo's death occurred long before the night of July 10, 2019. The Elizondos now bring the below causes of action against defendants to seek the relief to which they are entitled.

## B. PARTIES AND SERVICE

3.     Plaintiffs, Ronald Elizondo, Sr. and Maria Elizondo ("Elizondos") are residents of Corpus Christi, Nueces County, Texas. The Elizondos are the parents of Ronald Elizondo, Jr. ("Nano Elizondo Elizondo").   They bring this suit individually, and as lawful heirs of the estate of Ronald Elizondo, Jr. pursuant to TEX. CIV. PRAC. & REM. CODE § 71.004(b).   Ronald Elizondo, Sr. and Maria Elizondo are entitled to bring this action on behalf of Nano Elizondo pursuant to TEX. CIV. PRAC. & REM. CODE § 71.004(b) and § 71.021.   There is no legal representative for Nano Elizondo Elizondo's estate as he died intestate and no administration of the estate is required.

4.     Defendant, Trooper Donald Hinote ("Trooper Hinote"), is or has been a Trooper with the Texas Department of Public Safety. Trooper Hinote is a citizen of the State of Texas and has already been served and appeared through counsel in this matter.

5.      Defendant, the Texas Department of Public Safety ("DPS"), is a division of the government of the State of Texas. DPS is located in Travis County, Texas and has already been served and appeared through counsel in this matter.

6.      Defendant, City of Corpus Christi, ("Corpus Christi") is a political subdivision of the State and may be served by delivering a copy of the summons and amended complaint to the Mayor, Joe McComb, at 1201 Leopard Street, Corpus Christi, Texas 78401.

7.      Defendant, Detective Lorraine Matthews ("Detective Matthews") is a detective for the Corpus Christi Police Department. Matthews has been sued for her acts and omissions undertaken while in the course and scope of her employment with Corpus Christi Police Department and while acting under the color of state law. Matthews may be served at 321 John Sartain Street, Corpus Christi, Texas 78401.

8.      Defendant, Nueces County, Texas ("Nueces County") is a political subdivision of the State of Texas. It is located in the State of Texas and may be served by delivering a copy of the summons and amended complaint to the County Administrator located at 901 Leopard Street, Corpus Christi, Texas 78401.

9.      Defendant, Mark Gonzalez ("DA Gonzalez") is the elected District Attorney for Nueces County, Texas. Gonzalez has been sued individually and for his acts and omissions undertaken while in the course and scope of his employment with Nueces County and while acting

under the color of state law. Gonzalez may be served at the Nueces County District Attorney's Office located at 901 Leopard Street, Corpus Christi, Texas 78401.

10.     Defendant, Assistant District Attorney Angelica Hernandez ("ADA Hernandez") is the Assistant District Attorney for Nueces County, Texas. Hernandez has been sued for her acts and omissions undertaken while in the course and scope of her employment with Nueces County and while acting under the color of state law. Hernandez may be served at the Nueces County District Attorney's Office located at 901 Leopard Street, Corpus Christi, Texas 78401.

11.     Defendant, Assistant District Attorney Michelle Putman ("ADA Putman") is an Assistant District Attorney for Nueces County, Texas. Putman has been sued for her acts and omissions undertaken while in the course and scope of her employment with Nueces County and while acting under the color of state law. Putman may be served at the Nueces County District Attorney's Office located at 901 Leopard Street, Corpus Christi, Texas 78401.

12.     Defendant, Sharra Rodriguez ("Victim's Assistance Coordinator Rodriguez"), is the Nueces County District Attorney' Office Victim's Assistance Coordinator for Nueces County, Texas. Rodriguez has been sued for her acts and omissions undertaken while in the course and scope of her employment with Nueces County and while acting under the color of state law. Rodriguez may be served at the Nueces County District Attorney's Office located at 901 Leopard Street, Corpus Christi, Texas 78401.

## C.   JURISDICTION

---

13. This court has jurisdiction of this lawsuit as it arises under 42 U.S.C. §§ 1983; 1985. Additionally, this suit is brought under the Texas Wrongful Death Act, § 71.001, et seq. of the TEX. CIV. PRAC. & REM. CODE for those damages arising from the wrongful death of Nano Elizondo and under the TEXAS SURVIVAL ACT § 71.021, et seq. of the TEX. CIV. PRAC. & REM. CODE for those damages which are recoverable by Nano Elizondo had he survived. This suit is brought for the benefit of all parties, namely Nano Elizondo's parents and immediate family, who are entitled to recover under state law.

14. All state law claims relate to the same case or controversy and transaction upon which Plaintiff's federal claims are based. Specifically, Nano Elizondo's unlawful death.

15. Plaintiff's claims based on state law are brought under the TEXAS TORT CLAIMS ACT ("TTCA"), TEXAS CIVIL PRACTICES & REMEDIES CODE, Chapter 101. The Court has jurisdiction over this cause as the TTCA waives the State's sovereign immunity for claims involving personal injury and death caused by a condition or use of tangible personal or real property if the government unit would, were it a private person, be liable to the person making such a claim according to Texas law. TEX. CIV. PRAC. & REM. CODE § 101.021(2).

16. Initially, this suit was filed on June 23, 2020 in 347th Judicial District Court of Nueces County, Texas. This suit was then removed to this court by both then defendants Trooper Hinote and DPS on July 24, 2020.

## D.   VENUE

17. Venue is proper in this cause under 28 U.S.C. § 1391(b)(1) because defendants Trooper Hinote, City of Corpus Christi, Detective Matthews, Nueces County, ADA Gonzalez,

ADA Hernandez, ADA Putnam and Victim's Coordinator Rodriguez reside in this district. In addition, venue is proper under 18 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to this claim occurred in this district, namely, the shooting and ultimate death of Nano Elizondo.

### D.   FACTUAL BACKGROUND

18.     Ronald Elizondo, Jr., also known as Nano Elizondo Elizondo, was a 17-year-old adolescent who was the child and son of Ronald Elizondo, Sr. and Maria Elizondo. Nano Elizondo lived with his parents in their house and his two brothers for the duration of his short life. Because he shared his father's first name, Ronald Elizondo, Jr. he was affectionately also known as "Nano" Elizondo by his family and friends. Prior to his untimely death, Nano Elizondo was attending a local high school, playing varsity tennis, and assisting his father, a Tennis Pro, at Elizondo Tennis Center.



Nano Elizondo

19.     On July 10, 2019, Nano Elizondo was near the 7000 block of Clubgate Drive in Corpus Christi, Texas. This location is near the known residence for DPS Trooper and Peace Officer Donald Hinote. Trooper Hinote was at home on the evening of July 10, 2019.

20.     At approximately 1:26 a.m., Trooper Hinote was alerted to movement in the front of his residence by his home security system.   Trooper Hinote immediately armed himself with a Bersa Thunder .40 Caliber Semi-Automatic Pistol, ran out of his residence and located Nano Elizondo in a vehicle, owned by a third party, parked on the street near Hinote's residence. Believing that a crime was being committed, Trooper Hinote quickly and quietly approached Nano Elizondo, which subsequently resulted in Nano Elizondo's death.

21.     Inexplicably, Trooper Hinote did not contact local law enforcement officers or other DPS personnel to call for backup or to report a crime in progress. Rather, invoking the powers granted to him under the Texas Code of Criminal Procedure, Trooper Hinote quietly jogged barefoot and positioned himself behind Nano Elizondo and the vehicle's driver side door to investigate and/or detain Nano Elizondo. TEX. CODE OF CRIM. PROC. ART. 2.13 (2019).

22.     Trooper Hinote neither identified himself as a DPS peace officer nor alerted Nano Elizondo to his presence. Rather, Trooper Hinote shouted to Nano Elizondo, "Hey, get out of there!" Nano Elizondo, startled, ran in the only available direction away from the vehicle. Nano Elizondo was attempting to comply with Trooper Hinote's verbal order by exiting in the only path available to him. Nano Elizondo was not brandishing a weapon. Nano Elizondo was only attempting to comply with Trooper Hinote's orders when Trooper Hinote shot at Nano Elizondo at least four times. The shots fired by Trooper Hinote resulted in severe injury and the eventual death of Nano Elizondo on Clubgate Drive.

23.     When Trooper Hinote took aim wantonly and recklessly, and in violation of the law, and discharged his weapon at Nano Elizondo, Trooper Hinote was not under any threat, attack, or provocation. On the contrary, Nano Elizondo was attempting to flee. Trooper Hinote fired his gun without justification or legal cause. In fact, Trooper Hinote himself recklessly exacerbated the situation by sneaking up on Nano Elizondo, failing to call for backup, blocking Nano Elizondo's only path of exit, failing to identify himself and, then, startling Nano Elizondo who could only run in one direction. Trooper Hinote knew or should have known that the use of his gun constituted an unreasonable risk of harm. Trooper Hinote failed to use any other methods including requesting

backup, identifying himself as a law enforcement officer, shouting the words "freeze," "stop," "police," "DPS," or any other verbal commands that would have resolved the situation, or using any force other than deadly force to resolve the situation.

24.     After the shooting, Trooper Hinote did not immediately render aid to Nano Elizondo. Based on video footage, it is suspected that as much as five minutes elapsed between Trooper Hinote's shots and his rendering aide to Nano Elizondo. Eventually, Trooper Hinote ran back into his residence, retrieved his DPS issued medical bag and then administered aid.

25.     Less than two months prior to the death of Nano Elizondo, Trooper Hinote was disciplined by DPS for failing to secure his department assigned firearm, a Daniel Defense Rifle, a short barrel close quarters version of an AR-15. Trooper Hinote reportedly left the firearm unsecured on the rear seat of his patrol vehicle for an extended period of six days which resulted in the firearm being stolen. To Plaintiffs' knowledge, Trooper Hinote's firearm is still missing and unaccounted for. While admitting that Trooper Hinote's policy violation created a significant impact on public safety, DPS only suspended Trooper Hinote for one day off duty without pay.



> Donald Hinote, Trooper
> OIG2018-0887                                                                2
>
> Due to Trooper Hinote's negligence and inability to follow policy a Department issued firearm was stolen.  As of this date, the weapon has not been recovered and could very well be used in the crime as we have seen before.
> Trooper Hinote's violation of policy has more than a minimal impact on public safety.  It falls under category B in the discipline matrix as a presumptive penalty.
>
> I recommend Trooper Hinote receive one day off without pay.
>
> Respectfully Submitted,
>
> Justin Chrane
>
> Justin J. Chrane, Major
> Texas Highway Patrol Division

Trooper Hinote's Disciplinary Records

26.     Rather than discipline or re-train Hinote on DPS policy, DPS allowed Hinote to work an excessive amount of overtime in the weeks and days leading up to Nano Elizondo's death. In fact, in the pay period prior to Nano Elizondo's death, Hinote was found to have logged numerous hours of overtime while on-duty. Effectively, Hinote was never effectively disciplined nor re-trained regarding department policy.



Trooper Hinote's Pay Record

27.     Further, DPS made no mention regarding the use or storage of his DPS issued or allowed firearm. No policy was provided regarding the off-duty use of his weapon while stored at his home. By not properly training or disciplining Trooper Hinote, DPS failed to properly enforce its own policies to the detriment and eventual death of Nano Elizondo. DPS and Hinote should be held liable for their actions.

28.     Plaintiffs allege that all defendants, through their individual and joint acts, have continued a long-established custom or policy throughout Nueces County, Texas and the City of Corpus Christi. Defendants, together and separately, furthered a custom and policy that permits

the unbridled use of excessive, unnecessary and deadly force by peace officers within Nueces County and Corpus Christi with no concern for subsequent criminal liability. In essence, peace officers are allowed the freedom to use excessive force without fear of arrest, indictment or prosecution. Plaintiffs allege that this custom and policy was in effect at the time of Nano Elizondo's death and that such policy and custom was the moving force behind his death.

29.     Since the incident occurred in the City of Corpus Christi, the Corpus Christi Police Department (hereinafter "CCPD") responded to the Hinote residence after shots were reported fired. CCPD, DPS, and other officers arrived on the scene to secure the area and to begin an investigation into the shooting.

30.     Shortly thereafter, CCPD assigned Detective Lorraine Matthews to investigate the happenings that night. Detective Matthews and other CCPD officers conducted a thorough investigation, from July 10, 2019 to August 27, 2019, which included the interviews of multiple witnesses, a review of multiple video surveillance recordings, and a detailed crime scene investigation, amongst other activities.

31.     A video clip of the shooting taken by Hinote's home system was obtained by CCPD and is attached here as Exhibit A. (*See* P.'s Ex. A.) Eventually, a 114-page police report was prepared by the CCPD regarding this matter over the weeks long investigation.

32.     During the early morning hours of July 10, 2019, Detective Matthews conducted a recorded interview of Trooper Hinote. During this interview, in the very early stages of the investigation, Matthews advised Trooper Hinote, "So you're listed as a victim." A more detailed

interview was scheduled the following day with Trooper Hinote and his Department of Public Safety Officers' Association Counsel. By immediately classifying Trooper Hinote as a victim, Detective Matthews began what would be a litany of various acts that evidence a policy to ensure that Trooper Hinote, like any law enforcement officer, would be protected from any future responsibility.

33.     The day after the shooting, Detective Matthews conducted another recorded interview. This time, Detective Matthews advised: "This is just a formality… You are listed as the victim of a burglary that occurred…."

34.     However, during that interview, Detective Matthews uncovered several facts, which not only discounted the reasonableness of Trooper Hinote's actions, but also questioned whether Trooper Hinote had the requisite intent for a criminal act. Specifically, Trooper Hinote stated that he shot an individual who he did not know was armed, nor in his experience or lack thereof, did he expect to be armed. Further, Trooper Hinote agreed that Nano Elizondo had no reason to comply with Trooper Hinote because he was in plain clothes and had failed to announce he was a law enforcement officer:

> Det Matthews – "Could you see what he was holding?"
> Hinote – "I could not."
>
> _____
>
> Det. Matthews – "In your training, experience, knowledge of criminals, and I'm, er, were just gonna go to the type of criminals who would maybe commit burglary or that have had a history of that. Do they have……. Would they normally…… carry.. um….

Things that could be used as a weapon…. On them? Like a burglar would. Do you know, of that?"

Hinote – "I wouldn't know that…"

___

Det. Mathews – "…there is no expectation that he would comply because you don't know him, you really don't know if he knew you were a trooper, to him you are just a stranger."

Trooper Hinote – "I can't say there was a full expectation of him to comply…"[1]

35.     Even more concerning, is the overt bias exhibited by Detective Matthews during her interview.

Det. Matthews – "So, um… it's hard for me to talk to you because I am in the same profession as you."

36.     Plaintiffs allege that Detective Matthews had the necessary information to charge Trooper Hinote with a crime under the Texas Penal Code. Yet, she failed to do so. Plaintiffs allege that her actions as well as CCPD's decision to assign her to this matter was part of the furthering of the defendants' unlawful custom and policy to allow such unadulterated use of force in their county and city without consequence to law enforcement officers.

---

[1] Selected portions of Trooper Hinote's recorded interview with Detective Matthews on July 11, 2019.

37.     A review of the CCPD Police Records reveal that, only hours after the incident, Detective Matthews deleted the name of an individual who had been listed as a suspect in the report. It is alleged that Detective Matthews, without concluding her investigation, deleted Trooper Hinote's designation as a suspect in the report. Detective Matthews had the opportunity to opine or to later clarify Trooper Hinote's role throughout the report. Detective Matthews deletion of such information is telling.

| Seq. # | Type | | Name(Last, First, M) | | | Voided/Replaced by: (2039) MATHEWS, LORAINE L - 7/10/2019 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | INDIVIDUAL | | UNKNOWN, 1907100004 | | | | | | | Non-Hispanic |
| AKA | | | | Race W | Sex M | DOB | Age 00 | Height | | Weight |
| Address | | | | | | | | Home Phone | | |
| Employer Name/Address | | | | | | | | Business Phone | | |
| Scars, Marks, Tatoos or other distinguishing features | | | | | | | | Cell Phone | | |
| Physical Characteristics | | | | | | | | | | |
| Suspect Details | | | | | | | | | | |

CCPD Police Report.

38.     Under Texas Law, a person commits an offense by altering a document to be used as evidence in an official proceeding with the intent to impair its availability as evidence. TEX. PENAL CODE § 37.09. By listing and categorizing Trooper Hinote as the "victim" and by deleting his name as a suspect prior to concluding her investigation, Detective Matthews immediately framed her investigation to benefit Trooper Hinote and protect him from criminal liability. The only explanation for Detective Matthews' altering the record would have been to delete *any* reference that Trooper Hinote had engaged in an unlawful shooting or was a suspect in the incident.

Detective Matthews deleted the record with the intent to influence the outcome of the impending grand jury or subsequent criminal proceeding.

39.     By deleting the record, Detective Matthews also contributed to and furthered the custom and practice of allowing peace officers in Nueces County and Corpus Christi to use unnecessary, excessive and deadly force without fear of criminal liability or responsibility.

40.     Texas Law requires officer-involved deaths to be reported to the Texas Attorney General's Office. TEX. CODE OF CRIM. PROC. ART. 2.139 (2017).   Copies of reports are then mandated by law to be posted on the Texas Attorney General's website. *Id*. [2] Yet, as of the date of this complaint, according to the current Texas Attorney General's website, no report has been filed by either the DPS or CCPD.[3]  Choosing not to file the required public record was an attempt to again shield Trooper Hinote from responsibility. By not filing the required report, Detective Matthews and the CCPD continued and furthered the unlawful policy which allows officers to use excessive force without fear of being held responsible.

41.     On July 15, 2019, *only five days after Nano Elizondo's death*, Nueces County Assistant District Attorney Michelle Putnam contacted Detective Lorraine Matthews at CCPD and indicated that she desired to present "something" to the Nueces County Grand Jury scheduled to meet on July 18, 2019. Putnam advised Matthews that she should list Nano Elizondo as the

---

[2] In fact, Art. 2.139 calls for a report regardless of whether an officer is "on-duty" or "off-duty." Tex. Code Crim. Pro. (2017). The statute requires law enforcement agencies to denote whether the officer was on-duty or not. *Id* at Art. 2.139(b)(7).

[3] *See* https://oagtx.force.com/oisreports/apex/OISReportsPage.

offender for the crime Burglary of a Motor Vehicle. Detective Matthews notated the conversation in her offense report.   However, Detective Matthews' records indicated that ADA Putnam had not yet received CCPD's police report nor its nine accompanying, voluminous CDs of evidence detailing the investigation. In fact, Nueces County did not receive these investigation reports from CCPD until two days *after* the above referenced ADA Putnam / Detective Matthews conversation.

42.     Without reviewing that evidence, ADA Putnam instructed Detective Matthews to list Nano Elizondo as the offender, in effect making Trooper Hinote the victim. As a result, Nueces County proceeded to the Grand Jury to indict a dead man. It is alleged that ADA Putnam instructed Detective Matthews in an attempt to shield Trooper Hinote and to continue the established unlawful policy of Nueces County and the City of Corpus Christi.

43.     Even if alleged to have committed a crime during his life, Nano Elizondo, now deceased, cannot be held liable by any court. Proceeding to a grand jury for the presentation or investigation of a non-liable crime is not authorized by statute. TEX. CODE OF CRIM. P. ART. 20.09.[4] The decision by the Nueces County District Attorney's Office to list Nano Elizondo as an offender was a successful effort to frame an improper question to the grand jury and use the answer to obtain a no-bill indictment for Trooper Hinote.

44.     Without having received or reviewed CCPD's report, and by listing Nano Elizondo as the offender five days after his death, Nueces County presented no real case or choice to the

---

[4] "The grand jury shall inquire into all offenses *liable* to indictment of which any member may have knowledge, or of which they shall be informed by the attorney representing the State, or any other credible person." (Emphasis added).

grand jury. This action was an attempt to circumvent or sidestep the grand jury and to clear Trooper Hinote of any wrongdoing. Putnam's decision to instruct Detective Matthews to list Hinote as the victim was done without review of CCPD's lengthy investigation and with the sole intent to allow a law enforcement officer to escape liability. ADA Putnam's instruction continued and furthered the custom and practice of allowing peace officers, such as Trooper Hinote, to use unnecessary, excessive and deadly force within Nueces County and Corpus Christi against its citizens and without any fear of criminal liability or responsibility. The moving force of this widespread custom and policy contributed to Nano Elizondo losing his life.

45.     By Detective Matthews complying with ADA Putnam's request to list Nano Elizondo as an offender and Trooper Hinote as a victim, she participated and furthered the same unlawful custom and policy to protect officers' use of force throughout the county, no matter the facts.

46.     On or about August 16, 2019, Ronald Elizondo, Sr., Nano Elizondo's father, met Nueces County District Attorney Victim's Coordinator Sharra Rodriguez. Understandably, Elizondo, Sr. had several questions regarding his son's death. Elizondo, Sr. specifically asked about the status of the case and the date it would be presented to the grand jury.   With Elizondo Sr. present, Ms. Rodriguez attempted to contact Nueces County Assistant District Attorney Anjelica Hernandez to ask for "guidance." However, ADA Hernandez did not answer her phone. Victim's Coordinator Rodriguez told Elizondo, Sr. that she would have to check in with ADA Hernandez as the ADA was "in charge" of the case. Victim Coordinator Rodriguez advised

Elizondo, Sr. that when she determined the date the case would be presented to the grand jury, either she or ADA Hernandez would let him know.

47.     On or about August 22, 2019, Elizondo, Sr. was renewing his license tag at the Nueces County Courthouse. While there, Elizondo, Sr. recognized Victim Coordinator Sharra Rodriguez in the hallways of the courthouse. Immediately, Victim Coordinator Rodriguez, unnerved, admitted to Elizondo, Sr. that she did not call him and the case was proceeding to the grand jury in the next 15 minutes.   Elizondo, Sr., now jarred, suffered a panic attack and began contacting friends and family. A few hours later, Elizondo, Sr. learned that Trooper Hinote was no billed in the shooting of his son's death.

48.     Plaintiffs allege that Rodriguez's failure to contact and communicate with Elizondo, Sr. was part of a concerted effort to keep the Elizondo family away from information about the ongoing criminal process. It is alleged that Rodriguez's actions were an attempt to leave the Elizondo family in the dark while defendants manipulated the grand jury process to shield Trooper Hinote from liability. By misleading the Elizondo family, Victim's Coordinator Rodriguez contributed to and furthered the same custom and practice of allowing peace officers to exercise unnecessary, excessive and deadly force without any fear of criminal prosecution. This act alone and in coordination with the other alleged acts helped continue such policy.

49.     Assistant District Attorney Anjelica Hernandez was employed as the Nueces County top prosecutor on October 30, 2018.[5]  Prior to her service as a District Attorney, Hernandez had been elected in 2010 to the 105th District Court in Kingsville, Kleberg County, Texas. In 2014, Hernandez lost her seat in an election to her opponent who now occupies that bench.

50.     In October of 2015, Hernandez signed an agreement in lieu of disciplinary action following several complaints against her filed with the State Commission on Judicial Conduct. [6] The complaints included, among others, allegations of: impermissible *ex parte* communications; failing to recuse herself in matters that she was disqualified to hear; exhibiting bias and prejudice to certain litigants; conducting her own independent investigations; and abusing her authority.[7]

---

[5] *Former Judge who made deal to never run again Hired as top Nueces County Prosecutor.* Caller Times, October 20, 2018.

[6] Hernandez signed a Voluntary Agreement to Resign from Judicial Office in Lieu of Disciplinary Action as to Texas State Commission on Judicial Conduct matter numbers: 13-0407-DI, 13-0634-DI, 13-0830-DI, 13-1142-DI,14-0134-DI, 14-0955-DI,14-1157-DI, 15-0093-DI, and 15-0094-DI.

[7] Specifically, the complaints alleged "…that Judge Hernandez had engaged in numerous acts of judicial misconduct, including but not limited to: engaging in impermissible *ex parte* communications with attorneys, litigants, and / or criminal defendants; failing to recuse herself in matters she was disqualified to hear; exhibiting a bias and / or prejudice towards certain litigants and / or their attorneys; conducting independent investigations into pending criminal matters before her court; failing to comply with the Kenedy and Kleberg District Court and County Court Plan related to removing an attorney from the county's indigent defense appointment list; failing to treat attorneys and litigants in a patient, dignified and courteous manner, and abusing her authority…"

As part of the agreement, Hernandez resigned her judicial office and, among other things, agreed to be forever disqualified from judicial service in the State of Texas. By her voluntary agreement, Hernandez did not admit guilt, fault or liability regarding the allegations contained in

---

51.    When Hernandez was hired in her subsequent position as Chief Felony Prosecutor, Mark Gonzalez, the then newly elected District Attorney, by his own admission was aware of Hernandez's history.[8] Yet, Gonzalez placed her in arguably the most important position in the DA's office. By hiring Hernandez, Gonzalez continued and perpetuated and contributed to the custom and practice of allowing peace officers to exercise unnecessary, excessive and deadly force without any fear of criminal prosecution.

52.    Given Hernandez's track record, Gonzalez should have known that hiring Hernandez and affording her the powers of the lead prosecutor in the District Attorney's office, would again lead to deprivation of a third party's federally protected rights. Further, Gonzalez had knowledge as well as notice that Hernandez was inclined to commit exactly the type of misconduct alleged herein.   Such decisions also contributed to Nano Elizondo losing his life.

53.    Hernandez has substantial connections to the Texas Department of Public Safety. Primarily, Hernandez is currently married to Rodney Flores Hernandez. Mr. Hernandez is employed as a Sergeant and trooper by the Texas Department of Public Safety. Upon information

_____

the complaints. No findings of fact or conclusions of law were reached in any of the above complaints.

[8] "Gonzalez on Monday stood by his decision to hire Hernandez. He said the allegations she faced were 'not an issue' and called Hernandez a 'fierce prosecutor' who prioritizes the community's safety. 'I wish that people could look past the politics and actually look at the work that will be accomplished,' Gonzalez said. 'I know I'm gonna get criticized for that, but I got to do what's in the best interest of my office and I ultimately want results and I want to win on a case where we feel someone has victimized a member of our community. I think she's the best person for that job.'" *Former Judge who made deal to never run again Hired as top Nueces County Prosecutor.* Caller Times, October 20, 2018.

and belief, Sergeant Hernandez is a known acquaintance, colleague and friend of Trooper Hinote. In addition, ADA Hernandez is believed to have had connections and communications with DPS and Trooper Hinote or his contacts regarding his recent actions against Nano Elizondo.

54.     It is alleged that Trooper Hinote was protected by ADA Hernandez and her husband's contacts and communication. These acts and communications were done in an attempt to protect Trooper Hinote from criminal prosecution and to manipulate the grand jury process in order to protect Troper Hinote.

55.     Using the grand jury process as a method to shield police officers from liability is not unique. Historically, grand juries acted as a safeguard to government overreach. Roger A. Fairfax, Jr*., The Grand Jury's Role in the Prosecution of Unjustified Police Killings - Challenges and Solutions*, 52 Harv. C. R.-C. L. L. Rev. 397 (2017).   More recently, however, grand juries have become known as "the captive of the prosecutor." *Id. a*t 399. This likely stems from the fact that grand juries almost never vote to decline an indictment, a fact that raises concern when viewed in light of the recent wave of cases where the grand jury process has specifically resulted in police officers not being indicted. *Id*.[9]

---

[9]   J. David Goodman and Al Baker, *Wave of Protests After Grand Jury Doesn't Indict Officer in Eric Garner Chokehold Case*, N.Y. Times, Dec. 3, 2015, https://www.nytimes.com/ 2014/12/04/nyregion/grand-jury-said-to-bring-no-charges-in-staten-island-chokehold-death-of-eric-garner.html; Monica Davey, *Protests Flare After Ferguson Police Officer is Not Indicted*, N.Y. Times, Nov. 25, 2014, https://www.nytimes.com/2014/11/25/us/ferguson-darren-wilson-shooting-michael-brown-grand-jury.html; Mark Gillespie, *Calm Urged After Ohio Grand Jury Doesn't Indict Officers*, Associated Press, Dec. 29, 2015.

56.     Because prosecutors are scrutinized by political motivations on either side, and because police and prosecutors work toward the same goals, a prosecutor likely has mixed emotions when bringing an excessive violence case against police. After all, police do investigative work for prosecutors. While grand jury proceedings are secret, there is a fundamental conflict of interest when a prosecutor charges an officer. Prosecutors are tepid at best in pursuing cases against police officers. In fact, the numbers demonstrate how rare it is for police officers to face criminal prosecution in the state of Texas.[10]

57.     Although a prosecutor's behavior in the grand jury room is generally protected, his actions outside the grand jury are not. Since a prosecutor yields vast power within the grand jury room, only a few acts are needed to create a scheme like the one detailed herein. Plaintiffs allege that defendants acted together to contribute to, continue and perpetuate the custom and practice of allowing peace officers to exercise unnecessary, excessive and deadly force without fear of criminal prosecution.

58     Prior to Nano Elizondo's death, the number of peace officer abuse allegations presented to the grand jury in Nueces County is unknown. Again, this is primarily because grand jury proceedings are secret in nature. Further complicating the issue, is that state by state reporting is neither complete nor consistent. Alex Ura and Jolie McCullough, *Discipline, Charges Rare in*

---

[10]   Alex Ura and Jolie McCullough, *Discipline, Charges Rare in Texas Police Shootings,* The Texas Tribune, Aug. 20, 2016. Texas numbers suggest how rare it is for police to face criminal prosecution. (The Texas Tribune compiled data which indicated that 880 officers had been involved in police officer shootings in Texas's largest cities from 2010-2015. Yet, only 7 had actually faced criminal charges and only 1 had been convicted at the time of the article.)

*Texas Police Shootings*, The Texas Tribune, Aug. 20, 2016. Even then, police agencies fail to report such shootings to the appropriate oversight agencies.[11] Even more limited information exists on those cases that diverted before a grand jury.

59.     What is known is that in Nueces County, prosecutions of peace officers are rare. In fact, in Nueces County, peace officers avoid prosecution in even the most egregious excessive force cases. For instance, in 2015, multiple officers executed a no-knock warrant in pursuit of an individual, who was not even present at the time. Ray Rosas, the suspects uncle, was home with his elderly mother, when he shot at his supposed intruders.   While Rosas was arrested for the shooting, "the state didn't punish the officers for their lack of corroborating investigation, for their subjecting innocent people to unspeakable violence, for their incompetence in carrying out the raid, or for their wildly disproportionate use of force." Radley Balko*, The Inexplicable Prosecution-and-Vindication of Ray Rosas*, The Washington Post, Dec. 15, 2016. No formal charges were ever brought against the officers involved.   One of the officers was even shot by a fellow officer. *Id.[12]*

60.     In July of 2019, a Nueces County Grand Jury chose not to seek indictment against Corpus Christi police officer Gilbert Cantu. Officer Cantu shot Richard Salazar when he found him sitting on a couch under his own carport. Bill Churchwell, *Corpus Christi Police Officer Involved In Shooting Cleared By Grand Jury*, (July 1, 2019)

---

[11]  As previously alleged in this complaint, defendants failed to file the report for an officer-involved death as required under Tex. Code Crim. P. Art. 2.139 for Nano Elizondo's death.
[12] Although Rosas was charged with aggravated assault, a jury acquitted Rosas of all charges.

https://www.kiiitv.com/article/news/corpus-christi-police-officer-involved-in-shooting-cleared-by-grand-jury. Salazar had been smoking and was holding a lighter. *Id*. Cantu confused Salazar for a suspect in an unrelated robbery and mistook the lighter for a gun. Cantu fired his weapon six times hitting Salazar.

61.    In October of 2019, Corpus Christi Police Officer Phillip Peterson and three other officers responded to a disturbance call. Jonathan Munson, *Four Corpus Christi Police Officers Involved in Fatal Shooting Identified, (October 15, 2019)* https://www.kiiitv.com/article/news/local/four-corpus-christi-police-officers-involved-in-fatal-shooting-identified When they arrived, 22-year-old Emilio Mojica was holding a baseball bat. Officer Peterson fired several shots killing Mojico.   As of this time no charges have been filed against any of the officers despite the seemingly excessive use of deadly force. Officer Peterson reportedly returned to full duty in December 2019.

62.    In September of 2019, Senior Officer William Hobbs, responding to a disturbance call, approached and shot Justin Garcia who was standing in the street waving a pipe. Incidentally, Officer Hobbs had been previously accused of using excessive force in 2012; that case stemmed from Hobbs shooting into the rear of a vehicle that was exiting a parking garage and ultimately striking David Nunez several times. *Nunez v. City of Corpus Christi*, No. 2:12-CV-00092, 2013 U.S. Dist. LEXIS 110815 (S.D. Tex. 2013). No criminal charges were filed against Officer Hobbs in either incident despite his seemingly repeated excessive use of deadly force.

63.    Plaintiffs allege that the specific instances detailed above is evidence that the custom, policy and practice in Nueces County to allow the unchecked use of unnecessary,

excessive and deadly force amongst peace officers was well in effect prior to the death Nano Elizondo.

64.     Further, Nueces County itself, through the acts of DA Gonzalez, ADA Hernandez and others, have a reported history of mismanagement in the intake grand jury process even outside of peace officer shootings. The presiding judge of the 5th Judicial Administrative Region of Texas was quoted by local media sources in open court that the Nueces County District Attorney's Office grand jury intake process was not thorough. ADA Hernandez herself even agreed that there had been an issue.[13]

65.     Because of the above acts, both individually and jointly, defendants created and furthered an informal policy and custom which allowed peace officers within Nueces County and the City of Corpus Christi, Texas the sanctioned use of unnecessary, unreasonable, excessive and deadly force. Officers relied on such policy to use such force without fear of indictment,

---

[13] Specifically, it was reported by KRIS New 6 in response to the dismissal of indictments the following statements:

"The power of the state is incredible. You cannot get more powerful than the state of Texas and the use of the subpoena power of the grand jury. This is the second dismissal now by the District Attorney's office in as much as two or three weeks. The grand jury indicted him on four different offenses. Three sexual and two out of three of them dismissed because of, for a lack of better words, not a thorough intake process." Medary added.

KRIS News 6

Hernandez said, "I would agree with that judge but I think there's been changes made at the D.A's office that have significantly remedied that and that part of the problem with cases being rushed through the indictment is no longer present."

---

prosecution, or criminal conviction.  Such policy was in effect and was the moving force that caused Nano Elizondo to lose his life.

## E. CAUSES OF ACTION

### Count I
### Violations of 42 U.S.C. §§ 1983; 1985 by Hinote

66.     Plaintiff re-incorporates each and every prior allegation.

67.     Trooper Hinote is liable to Plaintiffs under 42 U.S.C. § 1983 because he used excessive force against Nano Elizondo in violation of Nano Elizondo's Fourth Amendment rights. Plaintiff's bring this claim in Trooper Hinote's individual capacity. The force used by Trooper Hinote was excessive, unreasonable, and unnecessary because:

      a.     Failing to exercise the highest degree of care in conducting his duties;

      b.     Negligently and recklessly shooting a suspect multiple times after the initial shot;

      c.     Negligently and recklessly shooting a suspect that never threatened Hinote;

      d.     Negligently and recklessly shooting a suspect that obeyed and complied with all verbal commands made by Trooper Hinote;

      e.     Failing to use mace/pepper spray or other non-violent methods to incapacitate Nano Elizondo before he was shot;

      f.     Negligently and recklessly approaching without warning to the rear of Nano Elizondo;

      g.     Failing to clearly identify himself as a peace officer;

      h.     Negligently and recklessly startling Nano Elizondo in order to confront him;

      i.     Negligently and recklessly positioning himself in the only exit path directly behind Nano Elizondo;

      j.      Failing to call for backup and / or to report the incident to any other law enforcement officer prior to making contact;

      k.     Failing to render aid to Nano Elizondo for almost five minutes after shooting him;

      l.      Failing to timely and properly remedy the dangerous condition or situation to prevent an incident such as the incident made the basis of this suit;

      m.    Other acts of negligence

68.     It would have been obvious to a reasonable officer that the conduct of Trooper Hinote was excessive, unreasonable, unnecessary, and unlawful in the circumstances of this case. The force used by Trooper Hinote was objectively unreasonable under the circumstances, and Trooper Hinote's actions violated clearly established constitutional rights to be free from unreasonable and excessive force.

69.     At all relevant times, Trooper Hinote was acting under color of state law. This unreasonable, unnecessary, and excessive use of force proximately caused Nano Elizondo to be shot multiple times, suffer personal injury and, ultimately, caused his death.

## Count II
## Violations of 42 U.S.C. § 1983 by Nueces County.

70.     Plaintiff re-incorporates each and every prior allegation.

71.     Plaintiff brings this claim under the reasoning provided in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978) and its progeny.

72.     Plaintiff alleges that Defendant was at all times acting under color of state law.

73.     Nano Elizondo's injuries and death were also proximately caused by the negligent,

grossly negligent, consciously indifferent and reckless conduct of Nueces County. Specifically, the Nueces County District Attorney's Office under the approval and direction of the District Attorney and its leadership, developed a custom and practice of allowing peace officers in Nueces County and the Corpus Christi area the freedom to use unnecessary, excessive and deadly force without fear of criminal liability or responsibility. In particular, Nueces County is liable by:

a.   encouraging peace officers to use deadly force without the fear of prosecution or indictment;

b.   encouraging peace officers to use excessive violence against potential criminal suspects without the fear of prosecution or indictment;

c.   encouraging a policy to mislead grand jury members regarding the evaluation of crimes by classifying victims as offenders;

e.   coordinating with law enforcement to ensure that officers who have used excessive force have done so will not be subject to indictment;

e.   encouraging and allowing an informal policy that increases the level of danger of potential excessive force actions by peace officers in Nueces County, Texas;

f.   misleading victims and their families in order to skirt responsibility;

g.   negligently and recklessly hiring individuals that in all likely hood will continue to advance such policies;

h.   failing to develop and train policies to screen off prosecutors who may have bias or conflicts of interest with alleged defendants or victims;

i.   hiring employees that in all likelihood would commit the misconduct complained of here given there background.

j.   failing to take appropriate measures to ensure that those employees controlling information and the presentation of evidence to the Grand Jury were free from a conflict of interest;

k.   failing to take corrective action and train his prosecutors after becoming aware that a grand jury problem intake problem existed in the county;

      d.      failing to train prosecutors to not change police reports;

      e.      failing to train and supervisor officers and prosecutors to take certain precautions to exclude the bias of officers and prosecutors;

      f.      and, other acts of negligence.

74.     The negligent, grossly negligent, deliberately indifferent and reckless nature of the Nueces County's customs, practices, and policies is established by the numerous "white-washed" investigations of complaints of police misconduct by peace officers in Neuces County.

75.     As a direct result of Nueces County's customs, practices, and policies, Trooper Hinote employed improper and excessive force against Nano Elizondo without fear of criminal liability or responsibility.

76.     Nueces County had or should have had actual or constructive knowledge that its customs, practices, and policies were dangerous and certain to result in the violation of constitutional rights. Nueces County's failure to address and correct these customs, practices, and policies demonstrates the County's deliberate disregard for the constitutional rights and safety of individuals subject to the peace officer law enforcement activities.

77.     Nueces County's customs, practices, and policies, therefore, amounted to conscious indifference to the rights of citizens such as Nano Elizondo, especially considering the magnitude of harm that might result from the unchecked use of excessive force by state and local peace officers.

78.     Defendant Nueces County's pattern, practice or policies created an environment in which constitutional violations flourished. These policies were the moving force that led to the

violation of Plaintiff's constitutional rights. At the time of Plaintiff's death, there had been a widespread practice in Nueces County of abusing prosecutorial powers to allow officers to escape any criminal responsibility. This practice was so widespread as to constitute the policy and custom of Nueces County itself.

## Count III
## Violations of 42 U.S.C. § 1983 by the City of Corpus Christi .

79.     Plaintiff re-incorporates each and every prior allegation.

80.     Plaintiff brings this claim under the reasoning provided in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978) and its progeny.

81.     Plaintiff alleges that Defendant was at all times acting under color of state law.

82.     Nano Elizondo's injuries and death were also proximately caused by the grossly negligent and consciously indifferent conduct of CCPD. Specifically, the CCPD under the approval and direction of its leadership, created, continued and furthered a custom and practice of allowing peace officers in Nueces County and the Corpus Christi area the freedom to use unnecessary, excessive and deadly force without fear of criminal liability or responsibility. In particular, CCPD is negligent, grossly negligent and reckless as follows:

      a.     encourages peace officers to use deadly force or excessive force against potential criminal suspects without the fear of criminal investigation, prosecution or indictment;

      c.     encourages a policy to mislead grand jury members regarding the evaluation of crimes by classifying victims as offenders;

      e.     encourages a policy to coordinate with Nueces County District Attorney's Office to ensure that officers who have used excessive or deadly force will

not be subject to further criminal prosecution;

    e.    encourages and allows an informal policy that increases the level of danger of potential excessive force actions by peace officers in Nueces County, Texas;

83.    Specifically to this case, CCPD furthered these policies, practices and customs by;

    a.    immediately labeling Trooper Hinote as a "victim;"

    b.    failing to report to the appropriate authorities an officer involved shooting so that Trooper Hinote could avoid responsibility;

    c.    altering an official police record to affect the outcome of an investigation;

    d.    allowing Texas DPS to influence and interfere with the on scene investigation;

    e.    failing to assign a non-biased investigator, or an outside investigator, in conducting the investigation of Trooper Hinote.

    f.    complying with Nueces County DA's instruction to frame the investigation in order to avoid any responsibility of Trooper Hinote;

84.    The negligent, grossly negligent, deliberately indifferent and reckless nature of the The City of Corpus Christi's customs, practices, and policies is established by the numerous "white-washed" investigations of complaints of police misconduct by CCPD in Neuces County and Corpus Christi.

85.    As a direct result of the City of Corpus Christi's developed customs, practices, and policies, Trooper Hinote employed improper and excessive force against Nano Elizondo without fear of criminal liability or responsibility.

86.    The City of Corpus Christi had or should have had actual or constructive knowledge

that its customs, practices, and policies were dangerous and certain to result in the violation of constitutional rights. The City of Corpus Christi's failure to address and correct these customs, practices, and policies demonstrates the department's deliberate disregard for the constitutional rights and safety of individuals subject to the peace officer law enforcement activities.

87.      The City of Corpus Christi's customs, practices, and policies, therefore, amounted to conscious indifference to the rights of citizens such as Nano Elizondo, especially considering the magnitude of harm that might result from the unchecked use of excessive force by state and local peace officers.

88.      The City of Corpus Christi's pattern, practice or policies created an environment in which constitutional violations flourished. These policies were the moving force that led to the violation of Plaintiff's constitutional rights. At the time of Plaintiff's death, there had been a widespread practice in Nueces County of abusing police and prosecutorial powers to allow officers to escape any criminal responsibility. This practice was so widespread as to constitute the policy and custom of the City of Corpus Christi itself.

### Count IV
### Supervisory and Hiring Liability Violations of 42 U.S.C. § 1983 by Mark Gonzalez.

89.      Plaintiff re-incorporates each and every prior allegation.

90.      Plaintiff brings this claim under the reasoning provided in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978) and its progeny.

---

91.     Plaintiff alleges that Defendant was at all times acting under color of state law.

92.     Constitutional injuries suffered by Nano Elizondo were also caused by a pattern and practice of misconduct which occurred with the knowledge and consent of those defendants who had supervisory capacity. Such Defendants affirmatively knew about, facilitated, approved, and condoned this pattern and practice of misconduct, or else affirmatively turned a blind eye to such conduct without taking any steps to stop it.

93.     By doing so, Defendant Gonzalez is personally responsible for Nano Elizondo's injuries because they knowingly, willfully, or at least recklessly caused the alleged deprivations of plaintiff's civil rights by their actions or by their deliberately indifferent failure to act.

94.     This misconduct described in this count was undertaken with malice, willfulness, and reckless indifference to the rights of others. The misconduct was undertaken, in part, pursuant to the policies and customs of Nueces County to not hold peace officers who are accused of excessive force criminally responsible as detailed above. Specifically, Gonzalez should be held liable by failing to supervise and take appropriate administrative procedures including:

    a.    negligently and recklessly hiring individuals that in all likely hood will continue to advance such policies;

    b.    failing to develop and train policies to screen off prosecutors who may have bias or conflicts of interest with alleged defendants or victims;

    c.    hiring employees that in all likelihood would commit the misconduct complained of here given there background.

    d.    failing to take appropriate measures to ensure that those employees

controlling information and the presentation of evidence to the Grand Jury
were free from a conflict of interest;

e.     failing to take corrective action and train his prosecutors after becoming
aware that a grand jury problem intake problem existed in the county;

f.     failing to train prosecutors to not change police reports;

g.     failing to train and supervisor officers and prosecutors to take certain
precautions to exclude the bias of officers and prosecutors;

h.     and, other acts of negligence.

95.    As a result of Gonzalez's misconduct, Nueces county placed individuals in
positions that continued the policy, custom and practice to allow officers the ability avoid criminal
responsibility for excessive force.

96.    Gonzalez should be held liable because Gonzalez's decided to hire an individual
whom he knew had a proclivity and likelihood to commit the misconduct alleged herein.

**Count V**
**Conspiracy to Deprive Constitutional Rights under 42 U.S.C. § 1983 by Nueces County,
The City of Corpus Christi, Detective Matthews, Trooper Hinote, the Texas Department of
Public Safety, DA Mark Gonzalez, ADA Anjelica Hernandez, ADA Michelle Putnam and
Victim's Coordinator Lorraine Matthews.**

97.    Plaintiff re-incorporates each and every prior allegation.

98.    Plaintiff brings this claim under the reasoning provided in *Monell v. Dep't of Soc.
Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978) and its progeny.

99.    Plaintiff alleges that all Defendants were acting under color of state law.

100.    Plaintiffs allege that Defendants, by both their individual and joint acts together,

conspired in order to establish a policy within Nueces County to allow peace officers to use unnecessary, excessive and deadly force without fear of criminal liability or responsibility. The establishment of this unwritten custom and policy was so widespread it was in fact the effective policy of Nueces County and the City of Corpus Christi. Because this custom and policy was in effect at the time of Nano Elizondo lost his life, Plaintiffs allege that it was in fact the moving force behind the Nano Elizondo Elizondo's constitutional violations.

101.    Plaintiffs allege that defendants' acts, both individually and jointly, evidence an agreement to establish the aforementioned unlawful custom and policy. In addition, the above acts are alleged to have been taken by defendants in furtherance of that agreement. Therefore, all defendants should be held liable as conspirators to the establishment of this unlawful policy.

**Count VII**
**Negligence and Gross Negligence by the Texas Department of Public Safety**

102.    Plaintiffs re-incorporate each and every prior allegation.

103.    Defendant DPS and its employee Trooper Hinote are liable to Plaintiffs for the negligent, grossly negligent, careless, and reckless conduct at the time of the incident, made the basis of this suit.   Defendants acted with gross negligence, as that term is defined by the Texas

Civil Practice and Remedies Code § 41.001(11). Specifically, the aforementioned acts were done with conscious and willful indifference to Nano Elizondo's safety and well-being and, as such, amount to gross negligence for which Plaintiffs seeks recovery of exemplary or punitive damages in an amount sufficient to deter such unconscionable and irresponsible conduct in the future. The grossly negligent acts and conduct of the Defendants were in heedless and reckless disregard of the rights and safety of Nano Elizondo and involved such an entire want of care as to indicate that it was the result of conscious indifference to his rights, welfare, and safety. The independent conduct of both Defendants constitutes negligence.

104.    Specifically, DPS is negligent, grossly negligent and / or reckless by :

a.      failing to properly train Trooper Hinote;

b.      failing to properly discipline Trooper Hinote;

c.      failing to adopt proper procedures for arrests while not in uniform;

d.      allowing a custom for Trooper Hinote to use his own firearm during arrests while not in uniform;

e.      failing to effectively enforce its disciplinary procedures regarding weapons;

f.      failing to develop policies regarding the immediate rendering of aid during an arrest while not in uniform;

g.      failing to develop procedures to report the suspected commission of crimes while not in uniform;

h.      failing to stop and / or restrict the storage or use of weapons at the residence of Hinote, given his disciplinary history;

i.      issuing and allowing the use of his weapon, off-duty at his residence in light of his disciplinary past, and;

j.      other acts of negligence.

105.    Each of these acts and omissions, singularly or in combination with others, constituted negligence which proximately caused the occurrences that made the basis of this action and the damages alleged here.

106.    Plaintiffs are the statutory beneficiaries of the decedent, Nano Elizondo. The Defendants' wrongful negligent acts, as described in this amended complaint, caused the death of Nano Elizondo. Nano Elizondo suffered actual injury from the wrongful, negligent acts of Defendants. Should Nano Elizondo have lived, he would have been able to bring this action against the Defendants for the claims contained in this amended complaint.

107.    Plaintiffs are the statutory beneficiaries under the Texas Wrongful Death Act and as such have the right to bring a survival action against Defendants on behalf of Nano Elizondo. Prior to his death, Nano Elizondo had a cause of action against Defendants for personal injuries sustained when he was injured and had he lived, Nano Elizondo would have been entitled to bring this cause of action against Defendants.

## **F. DAMAGES**

108.    Plaintiffs request that Defendants be summoned to appear and answer, and that on final trial, judgment be granted against Defendants, jointly and severally, for the following damages:

    a.   past medical expenses;

    b.   past and future compensatory damages;

    c.   past pain and suffering;

    d.   damages for loss of consortium;

e.  past and future mental anguish;

f.  past and future lost wages;

g.  funeral expenses;

h.  punitive and exemplary damages;

i.  pre-judgment and post-judgment interest;

j.  past and future damages for wrongful death and survival actions;

k.  costs of suit and attorney's fees pursuant to 42 U.S.C. § 1988;

l.  all other legal and equitable relief which may be necessary and proper to effectuate the purposes of 42 U.S.C. § 1983; and

m.  such other and further relief to which Plaintiffs may be justly entitled.

## G.   NO ABSOLUTE OR QUALIFIED IMMUNITY

109.   It is anticipated that Defendants Nueces County, DA Gonzalez, ADA Hernandez and ADA Putnam will raise a defense of absolute immunity. In that regard, Plaintiffs highlight that Defendants' conduct resides outside the actions "intimately associated with the judicial phase of the criminal process." …. A prosecutor acting as an investigator may not be entitled to absolute immunity. *Burge v. Parish of St. Tammany*, 187 F.3d 452, 478 (5th Cir. 1999). In addition, a prosecutor has no absolute immunity for legal advice given to the police nor for administrative duties or investigatory functions that do not relate to an advocate's preparation to initiate prosecution or further judicial proceedings." *Brown v. City of Houston*, 297 F. Supp 3d 748 (S.D. Tex. 2017), reconsideration sub nom. *Brown v. City of Houston, Texas*, CV H-17-1749, 2018 WL

1333883 (S. D. Tex Mar. 15, 2018). As the U.S. Supreme Court has explained, "a prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S. Ct. 2606, 2615 (1993).

110.    Plaintiffs here complain of Defendants advancement of an unlawful policy whose intent to was to allow and encourage the constitutional violation of citizens in their state. The specific acts alleged are not intimately associated with the judicial process and were designed to further the unlawful policy as detailed above. Consequently, defendants should not be entitled to absolute immunity.

111.    Additionally, Plaintiffs plead that it is clearly established law that every citizen of the United States has rights to be free from an unlawful seizure by law enforcement officials in accordance with the Fourth Amendment to the United States Constitution, as applied to the several State through the Fourteenth Amendment. No reasonable government official or agent would have acted as defendants did under the circumstances of this case by establishing the custom and policy as described in Nueces County. Consequently, defendants are not entitled to absolute or qualified immunity.

## H.   JURY DEMAND

112.    Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P.38(b) on all issues so triable.

## I.   PRAYER FOR RELIEF

113.     Plaintiffs respectfully pray that the Defendants be cited to appear and answer herein, that upon a final hearing of this cause, Plaintiffs have a judgment against Defendants, together with interest from the date of injury, and costs of court, and for such other and further relief, general and special, to which Plaintiffs may be justly entitled, either in law or equity.

Respectfully submitted,

**J. W. Bearden & Associates, P.L.L.C**

By: */s/ Wes Bearden*                            
James "Wes" Bearden, Attorney
Texas Bar No. 24071964
USDC, SD Bar No. 3541390
1341 Mockingbird Lane, Suite 820
Dallas, Texas 75247
Tel. (214) 396-7622
Fax. (888) 731-6940
Email: wes@beardenlawfirm.com
Web: https://www.beardenlawfirm.com/

**ATTORNEY FOR PLAINTIFFS**