United States District Court
Southern District of Texas
**ENTERED**
May 06, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RONALD ELIZONDO, SR., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:20-CV-00191 |
| | § | |
| DONALD HINOTE, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

In June 2020, Plaintiffs Ronald and Maria Elizondo (collectively, "the Elizondos") filed this civil rights lawsuit under 42 U.S.C. § 1983 against Defendants Donald Hinote and the Texas Department of Public Safety ("DPS") in state court following the shooting death of their son, Ronald "Nano" Elizondo, Jr. ("Elizondo"). (D.E. 1-1 at 2). Defendants subsequently removed the case to this Court. (D.E. 1). In an amended complaint, the Elizondos added the City of Corpus Christi ("Corpus Christi"), Detective Lorraine Matthews, Nueces County, District Attorney Mark Gonzalez, Assistant District Attorney Anjelica Hernandez, Assistant District Attorney Michelle Putnam, and Nueces County Coordinator Sharra Rodriguez as defendants. (D.E. 18). In a second amended complaint, the Elizondos further added DPS Sergeant Rodney Hernandez as a defendant. (D.E. 78).

Currently pending are the following motions: (1) Nueces County's motion to dismiss (D.E. 83); (2) Corpus Christi's motion to dismiss (D.E. 84); (3) Matthews's motion to dismiss (D.E. 85); (4) Gonzalez's, Putman's, Anjelica Hernandez's, and Rodriguez's

(collectively, "DA's Office Defendants") motion to dismiss (D.E. 86); (5) DPS's motion to dismiss (D.E. 87); (6) the DA's Office Defendants' and Nueces County's second motion to dismiss for lack of standing (D.E. 109); and (7) Sergeant Hernandez's motion to dismiss (D.E. 118). The Elizondos have responded to each of these motions other than Sergeant Hernandez's,[1] and the defendants have filed various replies. (D.E. 92, 93, 94, 95, 96, 103, 104, 105, 106, 107, 115).

For the reasons discussed further below, it is recommended that: (1) the DA Office Defendants' and Nueces County's second motion to dismiss (D.E. 109) be **GRANTED** and the claims against them in Counts II, IV, and V be **DISMISSED** for lack of standing; (2) the claims against all defendants in Counts III and V be *sua sponte* **DISMISSED** for lack of standing; (3) DPS's motion to dismiss (D.E. 87) be **GRANTED** in part and **DENIED AS MOOT** in part and that the state law claims against DPS in Count VI be **DISMISSED**; and (4) all other pending motions to dismiss (D.E. 83, 84, 85, 86, 118) be **DENIED AS MOOT**. Should the Court adopt these recommendations, the only remaining claim will be Count I against Hinote.

## I.   ALLEGATIONS AND CLAIMS

In the second amended complaint, the Elizondos allege the following. (D.E. 78). On July 10, 2019, Hinote, a state trooper, shot and killed 17-year-old Nano Elizondo. (*Id.*

---

[1] The Elizondos sought and were granted an extension to respond to Sergeant Hernandez's motion to dismiss, and the extended deadline to respond has not yet passed. (D.E. 120). However, this memorandum recommends dismissal of the claim against Sergeant Hernandez for a reason outside of those argued in his motion to dismiss, and therefore waiting for the response to his motion is unnecessary.

at 2). The Elizondos then filed this suit under 42 U.S.C. §§ 1983, 1985, the Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code § 71.001, et seq., and the Texas Survival Act, Tex. Civ. Prac. & Rem. Code § 71.021 et seq. (*Id.* at 5).

At 1:26 a.m. on July 10, 2019, Hinote, who was off-duty, was alerted by a home security system to movement in front of his home. (*Id.* at 7). He armed himself with a pistol and found Elizondo in a vehicle, owned by a third party, parked on the street. Hinote believed that Elizondo was committing a crime and quietly approached him. (*Id.*). Hinote did not contact law enforcement or report a crime in progress, but rather positioned himself behind Elizondo and the vehicle's driver side door. (*Id.* at 8). Hinote never identified himself as law enforcement or alerted Elizondo that he was there. Instead, he shouted, "Hey, get out of there!" Elizondo then ran away from the vehicle in the only direction available to him, which was towards Hinote. Elizondo did not have a weapon. Hinote shot at him at least four times, and Elizondo's injuries resulted in his death. (*Id.*).

Less than two months before this incident, Hinote was disciplined by DPS for failing to secure a department-assigned firearm that was stolen from the back seat of his car. (*Id.* at 9). Despite this, DPS suspended him for only one day without pay, and then allowed him to work overtime to make up the lost pay. (*Id.* at 9-10). By not training or disciplining Hinote properly, DPS failed to enforce its own policies, which resulted in Elizondo's death. (*Id.* at 10). Further, all defendants have a long-established custom or policy that allows law enforcement to use excessive, unnecessary, and deadly force with no concern for

3

subsequent criminal liability.  (*Id.* at 10-11).  This policy was in effect at the time of Elizondo's death and was the moving force behind his death.  (*Id.* at 11).

Following the shooting, the Corpus Christi Police Department ("CCPD") arrived on the scene to investigate.  (*Id.*).  Detective Matthews and other officers conducted a thorough investigation, and CCPD ultimately prepared a 114-page police report on the incident.  (*Id.*).  However, early in this investigation, Matthews interviewed Hinote and told him that he was classified as a victim.  (*Id.* at 11-12).  By immediately classifying Hinote as a victim, Matthews began the process of ensuring that Hinote would be protected from any responsibility for the shooting.  (*Id.* at 12).  This protection continued even though Hinote admitted he could not see what Elizondo was holding, could not say that a burglar would typically be carrying a weapon, and did not have a full expectation that Elizondo would comply because he never announced himself as law enforcement.  (*Id.* at 12-13).  The Elizondos allege that Matthews had the necessary information to charge Hinote with a crime, but failed to do so due to the custom and policy of not charging law enforcement officers for the unnecessary use of force.  (*Id.* at 13).  This also included manipulating the police report only hours after the incident to remove Hinote as a suspect.  (*Id.* at 14-15).  Moreover, despite this being an officer-involved death, it was never reported to the Texas Attorney General's Office as required.  (*Id.* at 15).

Five days after Elizondo's death, Assistant District Attorney Putnam contacted Matthews and stated that she wanted to present something to the grand jury, advising that Elizondo should be listed as the offender for the crime of burglary of a motor vehicle.  (*Id.*

4

at 15-16).  Putnam stated this even though she had not seen the police report or any of the evidence.  (*Id.* at 16).  This was also in furtherance of the policy of protecting law enforcement officers because Elizondo was listed as the offender, making Hinote the victim.  (*Id.*).  There was no other purpose to this action because proceeding to the grand jury to indict a dead person is not authorized by statute.  (*Id.* at 16-17).

In August 2019, Ronald Elizondo, Sr., met with Rodriguez, who was the Nueces County District Attorney Victim's Coordinator.  (*Id.* at 17).  He had questions about the shooting and asked when it would be presented to the grand jury.  (*Id.*).  Rodriguez tried to call Assistant District Attorney Hernandez, but she did not answer, so Rodriguez advised Elizondo Sr. that she would provide him with the date the case would be presented to the grand jury once she knew.  (*Id.* at 17-18).  A week later, Elizondo Sr. recognized Rodriguez while he was at the county courthouse renewing his license plates.  (*Id.* at 18).  Rodriguez admitted that she had not called him and that the case was proceeding to the grand jury within 15 minutes.  The failure to contact the Elizondos was an attempt to keep them away from information regarding the criminal process and further protect Hinote from liability. (*Id.*).

Prior to becoming an Assistant District Attorney in October 2018, Hernandez was a state judge who lost her seat in an election and then, in lieu of disciplinary action resulting from improper actions while on the bench, agreed to resign her judicial office and be disqualified from future judicial service in Texas.  (*Id.* at 19-20).  District Attorney Gonzalez knew of this history when he hired Hernandez as Chief Felony Prosecutor, and

by hiring her, Gonzalez furthered the custom and practice of ensuring law enforcement officers could use excessive and deadly force without fear of prosecution. (*Id.* at 20). Hernandez has significant connection to DPS, including being married to Sergeant Rodney Hernandez, a state trooper. (*Id.*). ADA Hernandez, Gonzalez, and Putnam also provide training sessions to DPS that are centered on teaching officers how to testify and prepare reports. (*Id.* at 21). These trainings did not comply with DPS policies regarding outside trainings, which must be reviewed and approved by the Chief Inspector, among other requirements. (*Id.* at 22). Sergeant Hernandez provided troopers with report templates generated by the District Attorney's Office, frequently referred to how ADA Hernandez wanted reports, and thereby participated and furthered the unlawful custom and practice of manipulating reports and protecting officers' use of force. (*Id.* at 22-23).

ADA Hernandez acted outside the scope of a prosecutor when she participated, directed, and instructed troopers and therefore helped develop the law enforcement policy of the various law enforcement agencies in Nueces County. (*Id.* at 23). Two troopers indicted for tampering with an official police report, official oppression, and unlawful restraint in the performance of their duties accused Sergeant Hernandez of favoring those he likes but waging a personal vendetta and threatening indictment to those he does not like. (*Id.* at 23-24). ADA Hernandez and Sergeant Hernandez protected Hinote from prosecution and manipulated the grand jury process. (*Id.* at 24-25).

The Elizondos identify several recent incidents where local law enforcement officers have used allegedly excessive force but were never charged. (*Id.* at 26-28). They

allege that these other incidents are further proof of the custom, policy, and practice in Nueces County to allow law enforcement officers to use unnecessary, excessive, and deadly force without fear of prosecution, which resulted in Elizondo's death.  (*Id.* at 28).

In Count I, the Elizondos allege that Hinote violated 42 U.S.C. §§ 1983, 1985 when he used unnecessary force against Elizondo in violation of his Fourth Amendment rights. (*Id.* at 29-31).  In Count II, the Elizondos allege that Nueces County violated 42 U.S.C. § 1983 because the District Attorney's Office developed a custom and practice of allowing law enforcement officers the freedom to use unnecessary, excessive, and deadly force without fear or criminal responsibility, and this policy was a proximate cause of Elizondo's death.  (*Id.* at 31-33).  Nueces County knew or should have known that its customs, practices, and policies would result in the violation of constitutional rights, but exhibited conscious indifference to the rights of citizens.  (*Id.* at 33).  In Count III, the Elizondos allege that the City of Corpus Christi violated 42 U.S.C. § 1983 because CCPD was grossly negligent and consciously indifferent to the rights of citizens when it furthered the custom and practice of allowing law enforcement officers the freedom to use unnecessary, excessive, and deadly force without fear or criminal responsibility.  (*Id.* at 34-36).

In Count IV, the Elizondos allege that Gonzalez violated 42 U.S.C. § 1983 by knowingly, willfully, or recklessly causing the deprivations of Elizondo's rights by failing to supervise, failing to take appropriate administrative actions, and hiring someone he knew had a likelihood to commit the misconduct alleged, all of which furthered the policy, custom, and practice of allowing law enforcement officers the ability to avoid criminal

responsibility for using excessive force.  (*Id.* at 36-38).  In Count V, the Elizondos allege that all Defendants conspired to deprive constitutional rights under 42 U.S.C. § 1983 by establishing a policy of manipulating reports to obtain a pre-determined outcome and to allow law enforcement officers to use unnecessary, excessive, and deadly force without fear of criminal liability.  (*Id.* at 38-39).  Finally, in Count VI, the Elizondos allege that DPS was negligent and grossly negligent under Texas law for failing to properly train or discipline Hinote, failing to adopt proper procedures for arrests while not in uniform, and allowing Hinote to use his own firearm for arrests when not in uniform, among other similar reasons.  (*Id.* at 39-41).

## II.  MOTIONS TO DISMISS

Rule 12(b)(1) provides for dismissal due to a lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  A Rule 12(b)(1) motion should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief.  *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998).  Where a Rule 12(b)(1) motion is filed at the same time as other Rule 12 motions, the court should consider the jurisdictional issue before addressing the merits.  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  The burden of proof for a Rule 12(b)(1) motion is on the party asserting jurisdiction.  *Id.* Dismissal under Rule 12(b)(1) is appropriate if a claim is barred by state sovereign or Eleventh Amendment immunity.  *See Warnock v. Pecos Cty., Tex.*, 88 F.3d 341, 343 (5th Cir. 1996).

Rule 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In determining whether to grant a motion to dismiss, the court must not go outside the pleadings and must accept all well-pleaded facts as true, looking at them in the light most favorable to the plaintiff. *Scanlan v. Texas A&M University*, 343 F.3d 533, 536 (5th Cir. 2003).

A pleading must include a short and plain statement of the claim showing that the pleader is entitled to relief and giving the defendant fair notice of what the claim is. Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, but the plaintiff must nonetheless provide more than merely labels and conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The factual allegations in the complaint are assumed to be true, even if unlikely, but the allegations must "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Id.* at 555, 570. A claim has facial plausibility where the factual allegations allow the court to reasonably infer that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Facts that are merely consistent with a defendant's liability are insufficient. *Id.*

## III. DISCUSSION

### a.   *DA Office Defendants' and Nueces County's Rule 12(b)(1) Motion to Dismiss for Lack of Standing (D.E. 109)*

In their second motion to dismiss, the DA Office Defendants and Nueces County contend that a recent Fifth Circuit case, *Lefebure v. D'Aquilla*, 15 F.4th 650 (5th Cir. 2021),

reaffirms that the Elizondos do not have standing to challenge any supposed non-prosecution policy.  (D.E. 109 at 1-3).  They argue that the claims raised here are not distinguishable from the claims raised in *Lefebure*, where the plaintiff alleged that the prosecutor adopted a non-prosecution policy that resulted in criminal activity that injured plaintiff.  (*Id.*).

The Elizondos respond that *Lefebure* is distinguishable from this case because the plaintiff in *Lefebure* raised only a claim that a prosecutor had failed to investigate and prosecute another person, which constituted a discriminatory failure to protect.  (D.E. 115 at 2-3).  In contrast, the Elizondos contend that they have not challenged any decision of whether to investigate or prosecute this case or any other case, but rather have alleged that "[p]rosecutors encouraged and allowed an informal policy of manipulating reports to obtain pre-determined outcomes."  (*Id.* at 3-4).

"Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "First, the plaintiff must have suffered an 'injury in fact.'"  *Id.*  "Second, there must be a causal connection between the injury and the conduct complained of."  *Id.*  "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Id.* at 561 (quoting *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 43 (1976)).

Supreme Court precedent holds that "a citizen lacks standing to contest *the policies of the prosecuting authority* when he himself is neither prosecuted nor threatened with

prosecution." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (emphasis added).  This is because "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Id.*  In *Linda R.S.*, the plaintiff raised a claim based on a Texas law that criminalized the non-payment of child support.  *Id.* at 615.  Texas courts interpreted this statute to apply only to legitimate children, and the plaintiff, the mother of an illegitimate child, alleged that this interpretation was discriminatory.  *Id.* at 616.  However, the Supreme Court held that, in order to raise such a claim, the plaintiff was required to show that her failure to obtain support payments resulted from the nonenforcement of the statute as to her child's father.  *Id.* at 618.  The Court concluded that the "prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed as speculative."  Thus, the Court concluded that the plaintiff had not shown the necessary direct relationship between the alleged injury and the claim raised, and therefore did not have standing.  *Id.*

In *Lefebure*, the Fifth Circuit concluded that the plaintiff, a crime victim, lacked "standing to sue a prosecutor for failing to investigate or indict her perpetrator, due to lack of causation and redressability."  *Lefebure*, 15 F.4th at 654.  In that case, the plaintiff alleged that the defendant, her cousin's husband, raped and sexually assaulted her on multiple occasions, and then conspired with the district attorney to ensure that he would not be investigated or prosecuted for his crimes.  *Id.* at 651-52.  Relying on *Linda R.S.*, the Fifth Circuit stated that, while victims of crimes "have a strong interest in their own physical safety and protection," they "do not have standing based on whether *other*

people—including their perpetrators—are investigated or prosecuted." *Id.* at 652 (emphasis in original). The Fifth Circuit first concluded that the plaintiff lacked standing to sue for the specific non-prosecution of her assailant, but also addressed the argument that there was wider discriminatory policy of non-prosecution and concluded that the plaintiff would lack standing in that instance as well. *Id.* at 654-57. The Fifth Circuit concluded that a challenge to a broader, discriminatory policy not to investigate or prosecute cases still had the same standing issues as a challenge to a specific decision not to prosecute an offender. *Id.* at 656.

Here, under the reasoning of *Linda R.S.* and *Lefebure*, the Elizondos lack standing for their claim that the DA Office Defendants and Nueces County had a policy of non-prosecution of law enforcement officers who use excessive force. Although they argue that their case and claim are distinguishable from those two cases, the Elizondos' framing of their claim in their response is not entirely consistent with the claim actually stated in the complaint. In their response, they contend that their complaint alleges that "[p]rosecutors encouraged and allowed an informal policy of manipulating reports to obtain pre-determined outcomes," which is true, but incomplete. (*See* D.E. 115 at 2-3). The complaint specifically alleges that the "pre-determined outcome" is the non-prosecution of law enforcement officers who use excessive force. The complaint routinely alleges that there was a custom, policy, and practice in Nueces County to allow law enforcement officers to use unnecessary, excessive, and deadly force without fear of

12

criminal liability.  (*See* D.E. 78 at 11, 15, 17-18, 20, 25-26, 29, 31-35, 38).[2]  The complaint does mention the manipulation of police reports several times, but only as a means to achieve the ultimate policy of non-prosecution of law enforcement officers for using excessive force.  (*Id.* at 14, 15, 17, 22-24, 32, 34, 38).  This is illustrated by the fact that the other examples the Elizondos give to allege the existence of a policy hinge on the non-prosecution of officers, not on the manipulation of reports.  (*Id.* at 25-28).  In sum, the ultimate basis of the claim is best left to the Elizondos themselves to explain, which they first did in paragraph 29 of the complaint:

> Plaintiffs allege that all defendants, through their individual and joint acts, have continued a long-established custom or policy throughout Nueces County, Texas and the City of Corpus Christi.  Defendants, together and separately, furthered a custom and policy that permits the unbridled use of excessive, unnecessary and deadly force by peace officers within Nueces County and Corpus Christi with no concern for subsequent criminal liability. In essence, peace officers, are allowed the freedom to use excessive force without fear of arrest, indictment or prosecution.  Plaintiffs allege that this custom and policy was in effect at the time of Nano Elizondo's death and that such policy and custom was the moving force behind his death.

(*Id.* at 10-11).  As this explanation makes clear, the ultimate underlying claim is that the policy of non-prosecution of law enforcement officers who use excessive force led to Elizondo's death.

---

[2] The Elizondos use various formulations of the claim throughout their complaint. In eight examples, they specifically state that the alleged policy allowed law enforcement to use excessive force without any fear of "criminal prosecution."  (*See* D.E. 78 at 18, 20, 25-26, 29, 31-32, 34).  In another seven examples, they state that officers could use excessive force without fear of "criminal liability" or "responsibility," which are synonymous in this context with "criminal prosecution."  (*Id.* at 15, 17, 31, 33-35, 38).

The claim that the policy of non-prosecution resulted in Elizondo's death is directly analogous to the claim in *Linda R.S.* that the Supreme Court dismissed for lack of standing. There, the plaintiff's argument was that the policy of non-prosecution for failure to pay child support for illegitimate children was the cause of her child's father's failure to pay child support. *Linda R.S.*, 410 U.S. at 616-18. Here, the plaintiffs' argument is that the prosecutor's policy of non-prosecution of law enforcement officers for the use of excessive force was the cause of Hinote's use of excessive force and their son's death. The logic of these two claims is the same and the plaintiffs in both cases unquestionably alleged an injury, but the Supreme Court concluded that this type of claim does not assert a "direct relationship between the alleged injury and the claim sought to be adjudicated," which is a separate prerequisite for standing. *Id.* at 618 (internal quotation marks omitted). Under the logic of *Linda R.S.*, it is at best speculative whether Hinote would have used excessive force against Elizondo in the absence of the alleged policy of non-prosecution, and that does not establish a strong enough connection, for standing purposes, between the injury and the claim sought to be adjudicated. Finally, that the Elizondos challenge a policy rather than the specific prosecutorial decision to not prosecute Hinote does not change this analysis, as the Supreme Court was also clear that citizens lack "standing to contest *the policies of the prosecuting authority* when [they are] neither prosecuted nor threatened with prosecution." *Id.* at 619 (emphasis added).

The Fifth Circuit's recent decision in *Lefebure* only reaffirms that the holding in *Linda R.S.* remains applicable to allegations like those raised here. The Elizondos assert

that their claim is different than the claim raised in *Lefebure* because they are challenging a policy of non-prosecution as opposed to the specific non-prosecution of Hinote. However, for standing purposes, the problem remains the same—even if challenging a policy, the Elizondos must show: (1) a causal connection between the injury suffered and the conduct complained of; and (2) that it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61.  The Supreme Court and Fifth Circuit have both held that crime victims can only establish a speculative connection between the injury they suffered and a policy of non-prosecution.  *Linda R.S.*, 410 U.S. at 618; *Lefebure*, 15 F.4th at 654, 659.  The Fifth Circuit reaffirmed this is true regardless of whether the plaintiff challenges a specific decision not to prosecute or a broader policy of non-prosecution.  *Lefebure*, 15 F.4th at 656.

The Elizondos further contend that, unlike in *Linda R.S.* and *Lefebure*, they are not claiming that there is a discriminatory failure-to-protect policy.  (D.E. 115 at 3).  However, while they never specifically reference discrimination in the complaint, the basis of their claim is indeed that there is a discriminatory policy that treats law enforcement officers differently than all others for the purposes of criminal prosecution, thereby allowing law enforcement officers to use excessive force without fear of prosecution.  This is analogous to *Linda R.S.*, where the claim was that there was a discriminatory policy that treated illegitimate children differently from legitimate children, thereby allowing the fathers of illegitimate children to avoid paying child support without fear of criminal prosecution.  As the Fifth Circuit stated in *Lefebure*, "the interest in the just administration of the laws,

including the interest in nondiscriminatory criminal enforcement, is presumptively deemed nonjusticiable even if invoked by persons with something beyond a generalized bystander's concern; only if the litigant is immediately affected as a target of enforcement can that presumption be overcome." *Lefebure*, 15 F.4th at 657 (citing LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 417, 418 (3rd ed. 2000)).  While the Elizondos have more than a generalized bystander's concern with just and nondiscriminatory criminal enforcement given the death of their son, they are not the *target* of enforcement and cannot overcome the presumption of nonjusticiability.

Finally, the Elizondos cite *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), and *Crane v. State of Tex.*, 759 F.2d 412 (5th Cir. 1985), to support that their claims are appropriate.  However, neither of these cases address standing issues, but rather general issues of municipal liability and immunity.  *See Pembaur*, 475 U.S. at 477-85; *Crane*, 759 F.2d at 415-32.  Moreover, the plaintiffs in both cases were personally charged with crimes, which separates their claims from the claims raised here and the claims raised and dismissed for lack of standing in *Linda R.S.* and *Lefebure*.  *See Pembaur*, 475 U.S. at 471-72; *Crane*, 759 F.2d at 414-15.  Thus, *Pembaur* and *Crane* are not analogous to this case and do not aid the Elizondos in establishing standing.

The Elizondos have not shown standing to challenge either the specific non-prosecution of Hinote for the death of their son or a wider policy of non-prosecution of law enforcement officers who use excessive force.  Accordingly, it is recommended that the motion to dismiss filed by the DA Office Defendants and Nueces County (D.E. 109) be

**GRANTED** and the claims against those defendants in Counts II, IV, and V be **DISMISSED** for lack of standing.  It is further recommended that the other motions to dismiss filed by these defendants (D.E. 83, 86) be **DENIED AS MOOT**.

> b.    *Sua Sponte Standing Analysis Regarding Other Defendants*

"Standing is a jurisdictional requirement and not subject to waiver."  *Doe v. Tangipahoa Parish School Bd.*, 494 F.3d 494, 496 n.1 (5th Cir. 2007).  Further, "[a] federal court must consider its jurisdiction *sua sponte*."  *Id.*  Thus, although the other defendants have not raised standing arguments in their motions to dismiss, it is necessary for the Court to consider the issue of standing *sua sponte*.

Here, the claims the Elizondos raise in Count III against Corpus Christi and in Count V against Corpus Christi, Detective Matthews, Hinote, DPS, and Rodney Hernandez are based on the same alleged non-prosecution policy, and they lack standing to raise these claims for the same reasons they lacked standing to raise them against the DA Office Defendants and Nueces County.  (D.E 78 at 33-36, 38-39).  The problems are once again causation and redressability, as the connection between the alleged policy furthered by these defendants and the injury suffered by the Elizondos is no less speculative than in the claims against the DA Office Defendants and Nueces County.  For the purposes of a standing analysis, the different roles each of these defendants played in the alleged non-prosecution policy do not matter because, if anything, the issues with establishing causation and redressability are even more pronounced against these defendants, who were not

17

making the ultimate decision on who to prosecute in individual cases or what policy to follow with regard to prosecutions in general.

Accordingly, it is recommended that all claims raised in Counts III and V be **DISMISSED** for lack of standing because they are based on the alleged non-prosecution policy.  It is further recommended that the motions to dismiss filed by defendants only named in these counts (D.E. 84, 85, 118) be **DENIED AS MOOT**.

      *c.*    *DPS's Rule 12(b)(6) Motion to Dismiss (D.E. 87) State Law Claims*

In its motion to dismiss, DPS contends that the state law tort claims in Count VI for negligence and gross negligence are barred by sovereign immunity.  (D.E. 87 at 3).  DPS argues that the Texas Tort Claims Act ("TTCA") is the sole avenue for common-law recovery against a governmental unit for all tort claims, but that the TTCA only waives sovereign immunity in narrowly defined circumstances.  (*Id.*).  First, DPS argues that the negligence and gross negligence claims do not fall within this limited waiver of sovereign immunity because there is no allegation of a sufficient "use" of personal property that would waive the state's immunity.  (*Id.* at 4-5).  Further, DPS contends that the Elizondos cannot succeed on a negligent-entrustment theory because DPS had no actual knowledge of any complaints against Hinote regarding his use of department-issued firearms in confronting suspects or effectuating arrests.  (*Id.* at 5-6).  Second, DPS asserts that the negligence and gross negligence claims are actually claims for intentional torts, and therefore are excepted from the TTCA's sovereign immunity waiver.  (*Id.* at 6-7).  DPS argues that Texas law establishes that uses of excessive force arise out of battery, not

negligence, regardless of whether the excessive force was intended or not, and battery is an intentional tort. (*Id.*).

The Elizondos first respond that DPS waived its sovereign immunity through negligent entrustment because DPS had knowledge of Hinote's incompetency with firearms when off duty at his resident. (D.E. 96 at 5-7). They contend that Hinote used his DPS-issued firearm to shoot Elizondo, and that DPS was aware of his recent failure to secure a firearm at his residence and took only minimal disciplinary action. (*Id.* at 7-8). Accordingly, the Elizondos assert that DPS negligently entrusted Hinote with a DPS-issued firearm at his home for use when off-duty. (*Id.* at 8). Second, the Elizondos argue that DPS can be liable for Hinote's intentional tort because the complaint alleges that DPS's negligent conduct caused Hinote's intentional action. (*Id.* at 8-11).

DPS replies that the cases the Elizondos rely on for their negligent entrustment claim are factually distinguishable because there is no allegation here that DPS knew or should have known that Hinote had a propensity to commit the act complained of. (D.E. 103 at 3-5). DPS argues that improperly storing a firearm in his car, resulting in it being stolen, is completely unrelated from whether Hinote received sufficient training and had the ability to use a weapon in the course of effectuating an arrest or subduing a suspect. (*Id.* at 4-5). Finally, DPS argues that the cases the Elizondos rely on for their intentional tort argument have been overruled by the Texas Supreme Court. (*Id.* at 5).

The TTCA is "the only, albeit limited, avenue for common-law recovery against the government, [and] all tort theories alleged against a governmental unit, whether it is sued

alone or together with its employees, are assumed" to be under the TTCA. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 659 (Tex. 2008). Under the TTCA, a governmental unit of the state of Texas is only liable for: "(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if: (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and (B) the employee would be personally liable to the claimant according to Texas law; and (2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem. Code § 101.021.

Absent a waiver of immunity, Texas cannot be liable for the negligence of its employees. *Texas A & M Univ. v. Bishop*, 156 S.W.3d 580, 583 (Tex. 2005). Under § 101.021(2), the state waives immunity if an employee uses tangible personal property to cause the injury. *Id.* Information is not tangible personal property. *Texas Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 580 (Tex. 2001). Thus, when a plaintiff raised a claim the DPS "failed to furnish the proper training, instruction, training manuals, and documents" to an officer, the Texas Supreme Court concluded that immunity was not waived because the claim did not allege an injury that resulted from the condition or use of tangible personal or real property. *Id.* Information remains non-tangible even if it has been reduced to writing. *Univ. of Texas Med. Branch at Galveston v. York*, 871 S.W.2d 175, 179 (Tex. 1994).

20

In *Petta*, the plaintiff alleged that, during a traffic stop, a DPS trooper "aimed his handgun at her and threatened to kill her. [She] then fled in her car, and [the trooper] pursued. During the course of the pursuit, [the trooper] shot at her tires more than once. He also aimed his shotgun at her while he was driving." *Petta*, 44 S.W.3d at 578. The plaintiff raised claims that DPS negligently trained and supervised the trooper. *Id.* at 577. The Texas Supreme Court concluded that DPS was entitled to immunity because the claims did not involve the use of tangible personal property, and therefore did not fall within the TTCA's immunity waiver. *Id.* at 580-81.

The TTCA immunity waiver also does not apply to claims "arising out of assault, battery, false imprisonment, or any other intentional tort." Tex. Civ. Prac. & Rem. Code § 101.057(2). "Claims of excessive force in the context of a lawful arrest arise out of a battery rather than negligence, whether the excessive force was intended or not." *City of Watauga v. Gordon*, 434 S.W.3d 586, 592-94 (Tex. 2014). Therefore, the TTCA does not waive immunity for claims of excessive force because they are necessarily an intentional tort, not negligence. *Id.* at 594. This is true regardless of whether the plaintiff frames the claim as negligence. *Harris Cty., TX v. Cabazos*, 177 S.W.3d 105, 111 (Tex. App. 2005).

However, a governmental entity can also be liable through a theory of negligent entrustment. *Russell v. City of Houston*, 808 F. Supp. 2d 969, 975 (S.D. Tex. 2011). In order to establish a claim of negligent entrustment, the plaintiff must allege: (1) the defendant entrusted property to someone; (2) that person was incompetent or reckless to handle such property; (3) at the time of the entrustment, the defendant knew or should have

known that the person was incompetent or reckless; (4) the person was negligent on the occasion in question; and (5) that negligence proximately caused the injury.  *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 758 (Tex. 2007).  Texas courts have applied these elements in negligent entrustment cases involving firearms.  *See, e.g., Prather v. Brandt*, 981 S.W.2d 801, 806 (Tex. App. 1998).  At the motion to dismiss stage, a plaintiff need only allege that the defendant had knowledge of the entrustee's incompetency. *Russell*, 808 F. Supp. 2d at 975.  However, a key element of a negligent entrustment claim is that the defendant must have had "actual knowledge" of the entrustee's "propensity to commit the act complained of or to use [the property] dangerously."  *Kennedy v. Baird*, 682 S.W.2d 377, 379 (Tex. App. 1984).

In *Goodyear*, which was decided at the summary judgment stage, a truck driver negligently fell asleep behind the wheel and caused an accident.  *Goodyear*, 236 S.W.3d at 758.  The plaintiff sued the driver's employer under a negligent entrustment theory.  *Id.* The Texas Supreme Court concluded that there was insufficient evidence that the employer knew or should have known that the driver was reckless or incompetent based on prior citations for driving without liability insurance, colliding with a vehicle at a stoplight, and speeding.  *Id.*

In *Russell*, the plaintiff was arrested and transported to jail.  *Russell*, 808 F. Supp. 2d at 971.  However, on the way to the jail, the officer "stopped the car in a secluded area that was not well lighted, stating that he had to cuff Plaintiff's hands behind her back prior to arrival.  He pulled her out of the car by the handcuffs and sexually assaulted her."  *Id.*

The court concluded that plaintiff could survive a motion to dismiss under a negligent entrustment theory where she alleged that the governmental entity knew of a previous complaint for sexual assault against the officer, but nonetheless provided him with a car, badge, gun, and handcuffs when it knew or should have known that this would create an opportunity, means, and location to commit a sexual assault. *Id.* at 974-75. Further, the court concluded that these claims did not arise out of the officer's intentional conduct because the claim was not based on the officer's assault, but rather the defendant's negligent issuance of tangible property to the officer. *Id.* at 975-76.

Here, as an initial matter, to the extent that DPS's motion seeks dismissal of the claims raised against it in Count V, the motion should be denied as moot due to the above recommendation that they be dismissed for lack of standing. Similarly, to the extent that the motion seeks dismissal of the state law tort claims against Hinote, the motion should be denied as moot because those claims have already been dismissed. (*See* D.E. 117).

As to the state law claims against DPS, the Elizondos have not alleged sufficient facts to state a claim that falls within the sovereign immunity waiver in the TTCA. First, to the extent that the Elizondos allege negligent training, they have not stated a claim that falls within the TTCA's waiver of immunity because information is not tangible personal property. The first seven specific claims of negligence and gross negligence in Count VI relate to DPS's alleged failure to train Hinote or to adopt certain policies that would have prevented the shooting and death of Elizondo. (D.E. 78 at 40). These claims are equivalent to the claims rejected by the Texas Supreme Court in *Petta* regarding DPS's failure "to

23

furnish the proper training, instruction, training manuals, and documents" to an officer. *Petta*, 44 S.W.3d at 580.  As in *Petta*, the allegations of negligent training do not involve the use of tangible personal property, and therefore do not fall within the TTCA's immunity waiver.  *Id.* at 580-81.

Second, to the extent that the Elizondos allege that DPS is directly liable for Hinote's negligent use of a firearm, which is tangible personal property, the shooting was a battery, which is an intentional tort and does not fall within the TTCA's waiver of immunity.  Claims of excessive force necessarily arise out of battery rather than negligence. *Gordon*, 434 S.W.3d at 592.  The Elizondos rely on *Delaney v. Univ. of Houston*, 835 S.W.2d 56 (Tex. 1992), and *Hendrix v. Bexar Cty. Hosp. Dist.*, 31 S.W.3d 661 (Tex. App. 2000), to argue otherwise, but both cases were decided before the Texas Supreme Court's categorical statement in *Gordon* that excessive force claims arise out of battery, not negligence, and that the state's immunity under the TTCA is not waived.

However, to the extent that the Elizondos rely on a negligent entrustment theory, they are correct that they could raise a claim that DPS was negligent in entrusting Hinote with a firearm and that conduct caused the shooting, even if the shooting itself was an intentional tort.  *See Russell*, 808 F. Supp. 2d at 975-76.  Claims "h" and "i" in Count VI are best construed as negligent entrustment allegations because they relate to DPS's entrustment of a firearm to Hinote.  (D.E. 78 at 40).  In order to be liable under a theory of negligent entrustment, DPS must not only have known of Hinote's incompetency in some general way, but also must have had actual knowledge of his "propensity to commit the act

complained of or to use [the property] dangerously." *Kennedy*, 682 S.W.2d at 379.  As alleged in the complaint, DPS did not have knowledge of Hinote's propensity to negligently discharge his firearm while effectuating arrests.  The Elizondos allege that Hinote's incompetency is shown by the previous incident where he left a department-issued firearm unsecured in his car and it was stolen.  (D.E. 78 at 9-10; D.E. 96 at 7-8).  However, this does not show that Hinote had a propensity to commit the act complained of here or to use the property dangerously in the way complained of here.  *Kennedy*, 682 S.W.2d at 379.

This case is distinguishable from *Russell* because there is no allegation in the complaint that Hinote had a history of negligently using or discharging firearms while effectuating arrests.  In contrast, in *Russell*, the officer had a prior complaint for sexual assault that the department was aware of, and the department nonetheless provided him with tangible personal property that he then used to commit another sexual assault.  *Russell*, 808 F. Supp. 2d at 974-75.  The department knew that the officer had the propensity to commit the act of sexual assault and was liable for negligently entrusting him with property that he used to commit the same act again.  That is not the same as what the Elizondos have alleged in the complaint, which is that DPS knew of Hinote's previous failure to secure a firearm that was then stolen, and therefore should not have allowed him to have a firearm at home at all.  (D.E. 78 at 9-10; D.E. 96 at 7-8).  Unlike in *Russell*, this case involves two different acts, albeit both involving a firearm.  Hinote's previous incompetence at *storing and securing* his department-issued firearm while at home does not establish a propensity

25

to negligently *use or discharge* his firearm while effectuating an arrest that DPS knew or should have known about.

In their response, the Elizondos contend that the *Russell* court never stated a requirement that DPS have knowledge that Hinote would "inflict the same or similar injury" as in a previous incident, but rather only that they knew of his incompetence. (D.E. 96 at 6-7). However, the *Russell* court's analysis is based on *Kennedy*, which did state that requirement. *See Russell*, 808 F. Supp. 2d at 975 (citing *Kennedy* in its discussion of the requirements for a negligent entrustment claim). This element was also not at issue in *Russell* because, as noted, the officer had a prior complaint for sexual assault before committing the sexual assault at issue in that case, and therefore the department had notice of his propensity to commit the act alleged. The Elizondos also rely on *Garcia v. Castro*, No. 2:15-CV-440, 2016 WL 3549363 (S.D. Tex. June 30, 2016), where the court found that the plaintiff had raised a sufficient negligent entrustment claim against DPS. However, the *Garcia* court did not address the propensity issue at all, or seemingly engage with the caselaw underlying *Russell* at all, outside of *Russell*'s bare statement that a plaintiff must allege knowledge of the entrustee's incompetency. *See id.* at *3-4. However, as noted, *Russell*'s analysis was based on *Kennedy*, which does discuss the propensity element, and the propensity element was not at issue in *Russell* because the entrustee had a known prior history of committing the act alleged.

The facts alleged in this case are more similar to the facts in *Goodyear*, where the Texas Supreme Court concluded that the entrustee's previous incidents, although all related

26

to driving a truck, were insufficient to establish a negligent entrustment claim against his employer when he had a different type of incident while driving a truck. *See Goodyear*, 236 S.W.3d at 758. The court reached this conclusion because, absent some showing of prior similar reckless or incompetent behavior, there is no showing that the entrustor knew or should have known that the entrustee was incompetent to handle the entrusted property. *See id.* Here, the Elizondos allege one prior incident involving Hinote and his firearm, but as in *Goodyear*, this prior incident did not involve the same type of behavior and is insufficient to state a claim for negligent entrustment because it does not show that DPS knew or should have known that Hinote was incompetent or reckless.

Accordingly, even taking the allegations in the complaint as true as required at the motion to dismiss stage, the Elizondos have not sufficiently alleged a negligence or gross negligence claim against DPS that falls within the TTCA's immunity waiver, and it is recommended that DPS's motion to dismiss (D.E. 87) be **GRANTED** in part and **DENIED AS MOOT** in part and that the state law claims against DPS in Count VI be **DISMISSED**.

## IV.  RECOMMENDATION

Accordingly, it is recommended that: (1) the DA Office Defendants' and Nueces County's second motion to dismiss (D.E. 109) be **GRANTED** and the claims against them in Counts II, IV, and V be **DISMISSED** for lack of standing; (2) the claims against all defendants in Counts III and V be *sua sponte* **DISMISSED** for lack of standing; (3) DPS's motion to dismiss (D.E. 87) be **GRANTED** in part and **DENIED AS MOOT** in part and

that the state law claims against DPS in Count VI be **DISMISSED**; and (4) all other pending motions to dismiss (D.E. 83, 84, 85, 86, 118) be **DENIED AS MOOT**.

Respectfully submitted on May 6, 2022.

_____
Julie K. Hampton
United States Magistrate Judge

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs*. *Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).